IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 07-cv-02697-MSK-BNB

KHALFAN KHAMIS MOHAMMED,

      Plaintiff,

v.

ERIC HOLDER, The U.S. Attorney,
HARLEY LAPPIN, Director of B.O.P.,
RON WILEY, ADX Warden, and
HARRELL WATTS, Administrator of National Inmate Appeals, and
FEDERAL BUREAU OF INVESTIGATION,

      Defendants.

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary

Judgment **(#167)**, to which Plaintiff Khalfan Khamis Mohammed responded **(#214)**, and the

Defendants replied **(#223)**.  Also at issue is Mr. Mohammed's Motion to Strike/or for Request to

Response **(#225)** and the Defendants' response thereto **(#226)**, Mr. Mohammed's Motion for

Request to File Exhibits Under Seal **(#216)**, which Defendants join and do not oppose **(#219)**,

and Defendants' Motion for Leave to Supplement **(#230)**.  Having considered the same,[1] the

---

[1]  The Court is mindful that Mr. Mohammed is proceeding *pro se* and, therefore, the Court construes his pleadings liberally and holds him to a "less stringent standard" than pleadings drafted by lawyers.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972).  Such liberal construction is intended merely to overlook technical formatting errors, poor writing style, and other defects in the party's use of legal terminology, citation, and theories.  *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  The Court, however, cannot act as a *pro se* litigant's legal advocate, and a *pro se* plaintiff retains the burden to allege sufficient facts to state a viable claim. Furthermore, *pro se* status does not relieve a party of the duty to comply with the various rules and procedures governing litigants and counsel or the requirements of the substantive law, and in

Court **FINDS** and **CONCLUDES** as follows.

## I.  Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## II.  Issue Presented

Mr. Mohammed is serving a life sentence at the United States Penitentiary-

Administrative Maximum prison facility ("ADX") in Florence, Colorado[2] for his conviction on

several charges resulting from the August 7, 1998 bombing of the American Embassy in Dar es

Salaam, Tanzania.  *United States v. Bin Laden*, 156 F.Supp.2d 359 (S.D.N.Y. 2001).  In this

case, Mr. Mohammed asserts three violations of his constitutional rights as a result of the Special

Administrative Measures ("SAMs") that have been imposed to limit his communication and

conduct.[3]  He seeks 1) a declaration that the SAMs to which he has been subjected are

unconstitutional and 2)  injunctive relief in the form of an order revoking such SAMs.  The

Defendants move for summary judgment on all claims.

---

these regards, the Court must apply the same standard to counsel licensed to practice law and to a *pro se* party.  *See McNeil v. United States*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

[2]The federal facility at Florence consists of several different components, including a minimum security unit, a medium security institution, the United States Penitentiary-High Security, and the United States Penitentiary-Administrative Maximum.

[3]  Mr. Mohammed's Prisoner Complaint (**# 95**) alleges seven claims, but in his Response (**#214**), he moves to dismiss all but three claims.  Pursuant to this request, Claims Two, Three, Five, and Six are dismissed.  The remaining claims are Claim One (the SAMs were imposed in violation of Mr. Mohammed's procedural due process rights), Claim Four (the SAMs violate his First Amendment rights), and Claim Seven (the SAMs restrictions and resulting housing assignment violate his Eighth Amendment rights).

### III.   Factual Background

The Court has reviewed all of the parties' submissions.  For purposes of this Motion only, the Court construes all disputed facts most favorably to Mr. Mohammed.  The following summarizes some pertinent facts, although others are specifically addressed in the Court's analysis.

### A.  SAMs Generally

A Warden of a prison is authorized by 28 C.F.R. § 501.3 to "implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury."  28 C.F.R. § 501.3(a).  The decision to impose SAMs is made by the United States Attorney General or the Attorney General's delegate.  Under the regulations, an inmate is provided written notice of the SAMs that are imposed and the basis for the restrictions "as soon as practicable."  28 C.F.R. § 501.3(b).  SAMs limitations may be imposed for up to one year, but may be extended yearly upon a determination of the Attorney General that "there continues to be a substantial risk that the inmate's communications or contacts with other persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons."  28 C.F.R. §501.3(c).

Inmates may challenge the imposition of SAMs or request modifications through the Bureau of Prison's ("BOP") Administrative Remedy Program, which provides various mechanisms for filing a grievance and several appeal steps.  28 C.F.R. § 501.3(e),  28 C.F.R. §§ 542.13, 542.14, 542.15.  According to guidelines promulgated in November 2010, the request and comments of a SAMs inmate challenging the initiation or renewal of the SAMs conditions

are forwarded to the appropriate United States Attorney's office and the FBI.  These agencies

then advise the BOP's legal department of their position on the request.  There has been no

representation as to what person or agency makes the ultimate decision as to whether a

modification is granted.

SAMs are annually reviewed, and inmates have the opportunity to comment in the review

process.  Three months before SAMs expire, the inmate is contacted and given the opportunity to

provide comments and suggestions concerning renewal or modification of the SAMs.  At ADX,

an in-person meeting occurs with the inmate to discuss his comments.  These comments are then

provided to ADX personnel and combined with other relevant information about the inmate,

including other requests, disciplinary information, correspondence to or from the inmate,

telephone conversations, types of education and leisure materials requested, and participation in

the various programming offered by the institution.

As of January 2011, 43 federal inmates were subject to SAMs;  27 were incarcerated at

the ADX.  Inmates subject to SAMs at ADX are housed in the H Unit to ensure that they do not

have unauthorized communication with inmates not subject to SAMs.  H Unit inmates generally

are subject to the same types of restriction and housing conditions as the general population at

ADX.  For example, they have the opportunity to participate in a three-phase program called the

Special Security Unit Program, which permits them to demonstrate progressively responsible

behavior and thereby obtain increased privileges.  Residents of H Unit begin at Phase One, a

baseline phase.  If the inmate advances to Phase Two, he is permitted three non-legal telephone

calls per month and allowed access to an expanded commissary list and art and hobby craft

items.  The inmate is permitted to go to the shower unescorted five times a week and have ten

4

hours of out-of-cell recreation per week.  If he progresses to Phase Three, he may have physical

contact with others and spend time with groups of other inmates.  Inmates in Phase Three eat one

meal together and engage in recreational activities, including watching television, reading, and

playing cards, and again have greater access to commissary and art and hobby craft items.  Each

Phase has defined eligibility requirements; progression from one phase to another is subject to a

specified process of review.  As of September 2011, six H Unit inmates had been selected to

participate in Phase Three.

### B.  Mr. Mohammed's arrest, conviction and prison conduct

Mr. Mohammed was convicted on May 29, 2001 of charges arising out of the Dar es

Salaam Embassy bombing.  He was arrested by South African authorities in 1999 for submitting

false documents to obtain political asylum, and was interviewed by agents of the Federal Bureau

of Investigation ("FBI") in October 1999.  According to the Report of Interview,  Mr.

Mohammed stated that he was part of the group responsible for the Embassy bombing and that

he was involved in a "jihad against America."  He had been selected to participate in an al Qaeda

training camp in Afghanistan several years prior to the bombing and had been specifically

approached to participate in it.  The Report of Interview states that Mr. Mohammed had

significant involvement in the conspiracy leading up to the Embassy bombing, including

obtaining transportation and real property used by the conspirators and providing other

assistance in the making of the bomb, that he was aware of the goal of the plot and was "happy"

that the bomb plot had succeeded, but "disappointed" that only Tanzanians had been killed.  It

reports that he was motivated by his study of history and Islam to participate in the bombing, and

that he would have continued with such activities had he not been caught.

Mr. Mohammed disputes the accuracy of the Report of Interview, stating that he "is in the total denial that those statements are his statements in their entirety." Pl.'s Resp., # **214**, at 14. He also claims his statements to the FBI were the result of torture.[4] Although the parties dispute the details of the report, this Court need not resolve the discrepancy in their positions because Mr. Mohammed was convicted of numerous capital and non-capital counts.[5] He was sentenced to life imprisonment, as well as several additional consecutive periods of incarceration, in October 2001. Mr. Mohammed was transferred to ADX on November 19, 2001.

Since his arrest, Mr. Mohammed has been involved in one significant disciplinary incident, which occurred on November 1, 2000, before his conviction. Mr. Mohammed was

---

[4] However, before his trial, Mr. Mohammed moved to suppress the statements he gave to the FBI on the grounds that his advisement of rights had been inadequate; this motion was denied. *United States v. Bin Laden*, 132 F.Supp.2d 168 (S.D.N.Y. 2001). That court noted Mr. Mohammed did not allege any coercion in connection with his motion to suppress. *Id.* at 194 ("No allegations of coercion, involuntariness, or invalid waiver have been made").

[5] Specifically: Conspiracy to Murder U.S. Nationals in violation of 18 U.S.C. § 2332(b); Conspiracy to Murder Officers or Employees of the U.S. in violation of 18 U.S.C. §§ 1114, 1116 and 1117; Conspiracy to use weapons of mass destruction against Nationals of the U.S. in violation of 18 U.S.C. § 2332a(a)(1) and a(3); Conspiracy to damage or destroy U.S. property in violation of 18 U.S.C. § 844(n); Bombing of U.S. Embassy in Dar es Salaam, Tanzania, resulting in 11 deaths, in violation of 18 U.S.C. § 844(f)(1), (f)(3) and 2; Use and attempted use of weapons of mass destruction against Nationals of the U.S. in Dar es Salaam, Tanzania in violation of 18 U.S.C. § 18 U.S.C. § 2332a(a)(1) and (a)(3); Murders in Dar es Salaam, Tanzania in violation of 18 U.S.C. §§ 930(c), 1111 and 2; Murder of Employees of the U.S. in Dar es Salaam, Tanzania in violation of 18 U.S.C. §§ 1111, 1114 and 2; Attempted Murder of Employees of the U.S. in Dar es Salaam, Tanzania in violation of 18 U.S.C. §§ 1111, 1114 and 2; Attempted Murder of Internationally Protected persons in Dar es Salaam, Tanzania in violation of 18 U.S.C. §§ 1111, 1116 and 2; Using and carrying an explosive during commission of a felony in violation of 18 U.S.C. §§ 844(h)(1), (h)(2) and 2; Using and carrying a dangerous device during the bombing of the U.S. Embassy in Dar es Salaam, Tanzania in violation of 18 U.S.C. § 924(c) and 2.

housed with a cell mate, Mamdoun Salim, at MMC New York.  On that day, Mr. Salim was

removed from the cell and escorted to a legal visit by a prison guard.[6]  While Mr. Salim was

gone, Mr. Mohammed used wet toilet paper to obscure the cell security camera.  When Officer

Pepe escorted Mr. Salim back to the cell,  Mr. Mohammed grabbed Officer Pepe's radio and Mr.

Salim struck Officer Pepe in the legs, knocking him to the ground.  Then Mr. Salim sprayed hot

sauce into Officer Pepe's eyes, stabbed Officer Pepe in the left eye and handcuffed left wrist to

restrain him.  Mr. Salim and Mr. Mohammed locked Officer Pepe in the cell, then left and hid in

the common area of the unit.  They were found by staff, resisted capture, and were ultimately

subdued.  Mr. Mohammed waived his appearance at the disciplinary hearing on the matter and

was found to have committed these acts.[7]  He was punished with loss of privileges and

disallowance of good conduct time, but was not criminally prosecuted.[8]

Although he did not dispute the allegations in the disciplinary proceedings, Mr.

Mohammed now argues that he had only a minimal role in the attack.  *See Salim,* 287 F. Supp.

2d at 294-95 (noting Salim's testimony that Mr. Mohammed's only role in the attack was to

obscure the video camera and to grab Officer Pepe's radio).  There is no dispute, however, with

the facts as recited in the Incident report.

### C.  SAMs regulating Mr. Mohammed's conduct and communication

SAMs were first imposed on Mr. Mohammed in 1999, before he convicted of the charges

---

[6] Incident Report (**#167-7**). Mr. Mohammed did not receive the incident report regarding this issue until July 26, 2004, after the criminal investigation was completed

[7] Discipline Hearing Officer Report, Defs.' Exh. A-8 (**#167-8**).

[8] Mr. Salim was criminally prosecuted for the attack.  *United States v. Salim*, 287 F.Supp.2d 250 (S.D.N.Y. 2003).

arising out of the Embassy bombing, and have been renewed annually since first imposed.  Prior to 2005, Mr. Mohammed's incoming and outgoing non-legal mail was not restricted to particular correspondents.[9]  *Id.*  Although the content of such mail was analyzed by the FBI, at least through 2003, the time for the analysis did not exceed more than five days for review of mail in English and ten days for review of mail in a foreign language.  *See, e.g.,* Pl.'s Exh. 7, Feb. 13, 2003 Notification of Modification of Special Administrative Measures.

### 1.  Current SAMs and Mr. Mohammed's compliance

At ADX, Mr. Mohammed is housed in H Unit.  He is currently in Phase Two.[10]  The most recent review of his SAM s occurred on or about December 9, 2010.  As of that date, SAMs have precluded Mr. Mohammed from having contact with any other inmate, visitor, or attorney except as specified.[11]  He is permitted to communicate orally with other inmates subject to SAMs only at predesignated times under circumstances approved by the relevant authorities.  Such meetings may be recorded or monitored.  Mr. Mohammed can have no contact with inmates who are not subject to SAMs, and may only communicate with  attorneys who affirm that no third party messages will be forwarded to or from him.[12]

---

[9]However, Mr. Mohammed's telephone and visitation privileges were limited to only his immediate family.

[10]Mr. Mohammed was previously placed in Phase Two in December 2009 but returned to Phase One in 2010 after engaging in a hunger strike, which was considered a group demonstration and a violation of the BOP's rules.  He advanced again to Phase Two on April 21, 2011.

[11] December 9, 2010 Notification of Extension of Special Administrative Measures (Defs.' Exh. Q-2, **#223-3**).

[12]There is apparently a procedure available so that the SAMs can be modified to permit communications for the purpose of establishing representation.  Since Mr. Mohammed has not asserted a Sixth Amendment right to counsel claim the Court does not examine the adequacy of

Mr. Mohammed's contact by telephone, mail and visits continues to be limited by SAMs. As of July 2011, Mr. Mohammed was permitted to have non-legal telephone calls[13] with his immediate family members[14] and four additional family members (two sisters-in-law, a brother-in-law, and a cousin), however such calls are monitored by the FBI .  Calls must be conducted in English[15] unless an approved interpreter is available to monitor the call, which requires advance notice.  If any call contains any indication of a discussion of illegal activity, the solicitation of or encouragement of acts of violence or terrorism, or any attempt to circumvent the SAMs, no further calls with family will be permitted for a designated period of time.  Mr. Mohammed's visitors are also restricted to his immediate family members; visits are subject to the same language and monitoring as telephone calls.

Mr. Mohammed 's correspondence with family members[16] is limited to three pieces of paper, double-sided.  The restriction as to the people with whom he can correspond, however, is more limited than it was in 2005.  Then, there was no restriction as to particular correspondents.  Now, for non-legal matters, he may correspond only with members of his immediate family and

---

those procedures.  There are a variety of other restrictions regarding attorney communications but these are not relevant to the issues in dispute.

[13]All ADX inmates, including those subject to SAMs, are generally limited to two 15-minute monthly social telephone calls.

[14] Mr. Mohammed's immediate family consists of his mother and eight siblings.

[15]Mr. Mohammed's native language is Swahili but he has some ability to speak and write in English.  He states that some of his immediate family members are illiterate and so he needs to be able to communicate with their children or spouses in order to maintain contact with them in writing.

[16]There are no restriction on Mr. Mohammed's ability to correspond with U.S. courts, federal judges, U.S. Attorney's offices, members of Congress, the BOP, and other federal law enforcement entities unless there is evidence of abuse of such privileges.

the four additional family members approved for telephone contact.[17]  All non-legal mail to or from Mr. Mohammed continues to be copied and forwarded to the FBI for analysis.  Compared to 2003, the delay for analysis has increased substantially.  Now it can be held for fourteen business days if written entirely in English, sixty business days if it contains any other language, and sixty days if the federal government has reasonable suspicion to believe that a code has been used.

Mr. Mohammed is also prohibited from communicating with news media.  He is not permitted to engage in group prayer with other inmates.  He is not permitted to share a cell with another inmate, and is not to communicate with other inmates except in specified circumstances.  Mr. Mohammed's SAMs also contain restrictions on the commissary items he may receive, his access to publications and reading material, and his access to broadcast media.  Mr. Mohammed's challenges to many of these restrictions appear to have been abandoned or mooted by changes to the SAMs since the filing of the lawsuit.

During his 10 years at ADX, Mr. Mohammed has complied with the SAMs but for one incident.  On December 7, 2010, Mr. Mohammed lost his non-legal telephone privileges for one month because he improperly spoke to several nieces and nephews during a telephone call with his siblings.

The Defendants admit that no correspondence to or from Mr. Mohammed has contained any content calculated to inspire terrorist attacks.  The Defendants offer no evidence of any conduct by Mr. Mohammed at ADX that demonstrates a "proclivity for terrorism" or has posed a

---

[17]It appears he was also temporarily permitted to correspond with one cousin, a friend, and a niece for the purposes of this lawsuit.

terrorist risk.  Indeed, the Warden at ADX has recommended that Mr. Mohammed be permitted

expanded communication with persons beyond his immediate family, including extended family

members, and states that ADX has sufficient resources to implement this modification.  Oct. 15,

2008 Memorandum from R. Wiley, Warden, Pl.'s Exh. 3, # **214-9**.

### 2.  Justification for current SAMs

According to the December 9, 2010 Notification of Extension of Special Administrative

Measures (Def.'s Exh. Q-2, #**223-3**), the Attorney General determined that SAMs were

appropriately applied to Mr. Mohammed because of his "proclivity for terrorism."  This notice

further states that the United States Attorney for the Southern District of New York has

determined that there is a "substantial risk that [Mr. Mohammed's] communications or contacts

could result in death or serious bodily injury" based on Mr. Mohammed's involvement in the

Embassy bombing and Mr. Mohammed's "recent efforts to make contact with [Mr.

Mohammed's] adoptive brother who is suspected of previously helping [Mr. Mohammed] obtain

a fraudulent passport and visa."  *Id.*  Therefore, the United States Attorney thus concludes that

Mr. Mohammed possesses a "longstanding commitment to jihad, which strongly suggests that

[he] would advocate violence in communications with the outside world, if permitted to do so."

*Id.*  The notice informs Mr. Mohammed that the FBI agrees that the SAMs should be extended

on the grounds that Mr. Mohammed's involvement in the Embassy bombing "carries with it the

potential to not only compel other inmates to see [Mr. Mohammed] as a source of guidance and

inspiration, but also to radicalize others who may be inclined to commit acts of terrorism."  *Id.*

In addition, the Defendants have provided an affidavit from Donald R. Shannon of the

FBI.  He states that SAMs are not imposed on all inmates who have been convicted of terrorism-

11

related charges.  The current SAMs are imposed on Mr. Mohammed because his conduct and individual circumstances.  Of particular concern to the FBI is Mr. Mohammed's pre-conviction involvement with terrorism related groups ( participation in 1994 in an al Qaeda-sponsored training camp in Afghanistan, his role in training others in Somalia in 1997, his embrace of the notion of "jihad" against the United States, as well as his status within the global terrorist movement as a participant in a high profile bombing attack).  Mr. Shannon states that it is the FBI's opinion that there is a continuing need to restrict and monitor Mr. Mohammed's communications because of his significant knowledge and experience in al Qaeda's purposes and tactics and his personal reputation within the organization.  Therefore, it is the FBI's conclusion that Mr. Mohammed has the potential to inspire and radicalize others who are inclined to acts of terrorism.  The FBI further concludes that Mr. Mohammed's past behavior is an indication of his future conduct, as evidenced by his participation in the attack on Officer Pepe in 2000.

To demonstrate the potential risk,  Mr. Shannon refers to another inmate convicted of terrorism charges who was successful in transmitting messages to terrorist organizations through an attorney and translator while incarcerated.  Thus, the FBI deems restrictions on outgoing communications to be appropriate and regulates incoming mail and telephone calls to prevent inmates from receiving communications that might further radicalize them.

Mr. Shannon states that Mr. Mohammed has two extended family members (a nephew and an adopted brother) whose activities raise security questions.  Purportedly, the nephew was in contact with Mr. Mohammed during the time leading up to the bombing and visited the house

in Dar es Salaam where the bomb was manufactured.[18]  Mr. Mohammed's adoptive brother,

Nassor Khamis Mohammed, was purportedly involved in immigration fraud; however, it now

appears that Mr. Mohammed is permitted to correspond with this brother.

    Mr. Shannon also states that limitation of contact among inmates, such as in group

prayer, are deemed necessary to ensure that inmates do not communicate with each other to

conspire with the purpose of circumventing SAMs restrictions, facilitating terrorist plots, or

harming prison staff.  These restrictions are also required because many of the inmates subject to

SAMs communicate in languages other than English, which would require real time monitoring

by translators; the FBI and Bureau of Prisons ("BOP") do not have the capacity to provide

enough translators to permit these activities.[19]

## IV.  Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if

no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and

a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Substantive law governs

what facts are material and what issues must be determined.  It also specifies the elements that

---

[18]Mr. Mohammed denies that this nephew had any role in the bombing. Again, there is no need to resolve any factual dispute in conjunction with determination of this motion.

[19]Mr. Mohammed does not offer any evidence to dispute these facts but contends that the Court should disregard Mr. Shannon's affidavit because it is not supported by documentary evidence.  He also contends at Mr. Shannon's evidence is not credible, primarily pointing to the fact that Mr. Mohammed's SAMs have been modified at various times.  The affidavit will not be disregarded on the grounds that it is not supported by documentary evidence but the evidence it sets forth will be considered in the full context of Mr. Mohammed's individual circumstances and history.

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

     When the movant has the burden of proof on a claim or defense, the movant must

establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R.

Civ. P. 56(e).  Once the moving party has met its burden, to avoid summary judgment the

responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material

fact, no trial is required.  The court then applies the law to the undisputed facts and enters

judgment.

     When the moving party does not have the burden of proof at trial, it must point to an

absence of sufficient evidence to establish the claim or defense that the non-movant is obligated

to prove.  If the respondent comes forward with sufficient competent evidence to establish a

*prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient

competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## V.    Analysis

### A.    Claim Four: First Amendment

Because elements of the analysis of Mr. Mohammed's First Amendment claim assist in determination of his other claims, this claim will be addressed first.  Mr. Mohammed's First Amendment claim is based primarily on current SAMs applying to his correspondence and visitation, in particular to the: (1) limitation of Mr. Mohammed's communications and visitation to his immediate family, excluding his nieces, nephews, and in-laws; (2) delay in the sending and receiving of mail due to the FBI's translation and monitoring, particularly since the delays used to be much shorter.[20]

It is well established that prisoners retain First Amendment rights.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  This includes a right to free flowing incoming and outgoing mail.  *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (noting that courts generally afford greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail).  SAMs that infringe on Mr. Mohammed's First Amendment rights of free speech and association may be lawful if they are reasonably related to legitimate

---

[20]Mr. Mohammed also appears to object to treatment of mail from courts, government agencies and representatives, and from lawyers (other than his own legal representatives) or legal societies as non-legal mail, subject to copying and monitoring.  Pl.'s Resp., # 214-2, at 123. However, it is unclear how Mr. Mohammed believes that his First Amendment rights have been infringed.  There is no evidence of restriction in his legal mail, and the case he cites, *Jones v. Brown*, 461 F.3d 353 (3d. Cir. 2006), concerns a prison's practice of opening and copying an inmate's legal mail.  Mr. Mohammed's simple assertion that certain documents other than correspondence to and from his legal representatives should be treated as legal mail does not demonstrate a constitutional violation.

penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987).  To make this determination, the Court must examine the following factors: (1) whether a rational connection exists between the SAMs and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the SAMs; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights. *Id.* at 89-91.  In evaluating a challenged prison regulation, the Court is instructed to give appropriate deference to prison administrators "who are actually charged with and trained in the running of the particular institution under examination." *O'Lone*, 482 U.S. at 349 (quotation omitted).

Mr. Mohammed bears the burden of showing that the SAMs relating to his communications are not reasonably related to the interests asserted by the government.  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).  The Defendants contend that Mr. Mohammed cannot present a *prima facie* case because the pertinent SAM restrictions are justified by the following legitimate interests: (1) preventing terrorist acts, (2) ensuring that Mr. Mohammed  does not engage in communications that jeopardize national security, (3) promoting safety of federal prisons, including safety of other inmates, (4) promoting the effective operation of law enforcement agencies, including permitting them to efficiently allocate resources.  Defendants further argue that the restrictions further these interests by reducing the risk that communications coming from the ADX could reveal information that could lead to an attack against the prison or against government personnel.  They also assert that restrictions on incoming communications are needed to prevent radicalization of inmates or passing along of messages that could result in

16

coordinated activities by the inmates.  This requires monitoring all of Mr. Mohammed's communications and adequate time for review, including translation.  Because of the limits of the Government's resources, the volume of correspondence, telephone calls, and visits must be kept to a level where review can reasonably be achieved.

     **1.**     **Rational Connection Between the SAMs and the Interests to be Promoted**

Defendants argue that limiting Mr. Mohammed's correspondence and visitation to his immediate family and four other family members serves two purposes.  First, it reduces the possibility that Mr. Mohammed will engage in communications with persons outside the prison facility that could lead to terrorist acts or other actions that could jeopardize national or institutional security, and second it reduces the chance of further radicalization and of coordinated activities within the institution caused by incoming mail.   Because the FBI monitors the communications of 20 inmates, the limitation of its resources further require that limitation of the volume of communications reviewed.  The FBI estimates that the time limits given, 14 days for correspondence in English and 60 days for foreign language correspondence, are needed to thoroughly and accurately translate and analyze the communications.

There is no dispute that maintaining prison security and preventing advocacy of violence and radicalism both inside and outside the prison are legitimate governmental interests. Appropriate allocation of prison and other governmental resources is also a legitimate interest. However, because the SAMs at issue are individually crafted to address the risk associated with Mr. Mohammed, the question is not whether SAMs, generally, are rationally related to a penological objective, but instead whether the Government has shown that there is a rational connection between the particular SAMs applied to Mr. Mohammed and a penological objective.

The Government's general justifications for SAMs - involvement in terrorist activities and dangerous communication by others during incarceration - do not address Mr. Mohammed's conduct or his particular risks.  The Government has identified only three specific instances or risk factors applicable to Mr. Mohammed: statements made in the Investigation Report, his 2001 conviction for the charges arising out of the Dar Es Salaam bombing, and his  participation in a prison incident in 2000.  These all had occurred prior to the time when Mr. Mohammed's written correspondence became more restricted, and there has been no showing that new circumstances justify greater restriction.  In addition, there is no showing that the persons with whom Mr. Mohammed wishes to communicate pose a particular threat either to the security of the prison or to the public at large.[21]

Mr. Mohammed points to the fact that the Warden of ADX has recommended that Mr. Mohammed be permitted to correspond with more members of his family and community, and that until approximately 2005, his correspondence was not been limited to his immediate family. As a consequence, the Court finds that Mr. Mohammed has come forward with sufficient evidence to make his *prima facie* showing that there is no rational connection between the

---

[21]  With regard to the effect of limited funding justifying SAMs, a substantially more complete showing must be made by the Government.  It is possible that limited resources may impact the ability of an institution to meet penological objectives, but that does not necessarily mean that particular restrictions on specific inmates are rationally related to such objectives.  For example, simply because there is insufficient manpower to screen all mail coming into a prison does not entitle the prison to select particular inmates who cannot receive mail, or to limit the people with whom inmates may communicate.  *See Guajardo v. Estelle*, 580 F.2d 748 (5th Cir. 1978) (state cannot assert its administrative convenience as a ground for a numerical limitation on inmates' personal correspondence without showing that order, security or rehabilitation were affected).

current restrictions on communication with those outside his immediate family.

### 2.   Alternative Means of Exercising the Right

Defendants argue that Mr. Mohammed also cannot show that he has no  has alternative means of exercising his First Amendment rights.  As grounds, they note that there is no restriction on his ability to correspond with his attorneys who have signed the affirmation acknowledging receipt of Mr. Mohammed's SAMs or on correspondence to U.S. courts, federal judges, U.S. Attorney's offices, members of Congress, the BOP, and other federal law enforcement entities. He may now send as many letters as he wishes to those on his approved list of correspondents.  He may also talk by telephone to those approved for telephone calls. Defendants emphasize that in considering this factor, there is no requirement that the alternatives be ideal, only that they be available. *Overton*, 539 U.S. at 135.

In response, Mr. Mohammed argues that the ability to communicate with the approved group of correspondents doesn't compensate for his inability to communicate with family members that are now excluded.  The fact of who is on the list or not is undisputed. Determination of this factor thus depends on whether the right at issue is considered to be Mr. Mohammed's right to communicate with persons outside of the facility in general or with his nieces and nephews and other community members specifically.  In the context of this element, the "right" at issue is to be viewed both "sensibly and expansively." *Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989).  Given this authority, the Court understands the limitations to infringe on Mr. Mohammed's right to expression and to maintain contact with his family as a general matter.

Again, giving Mr. Mohammed the benefit of all favorable inferences, his evidence may

be sufficient to show that alternative means of exercising his First Amendment rights are not available for maintaining his familial associations.  All of his non-legal communications are limited in the same manner.  This distinguishes Mr. Mohammed's case from situations where, for example, one mode of communication (such as visitation) with a small number of persons was restricted, but other modes of communication were still available with those persons or with a wider group of other persons.  *See e.g., Overton*, 539 U.S. at 132-35 (prohibition on inmate visits with minor nieces and nephews did not violate First Amendment; inmates could communicate with those children by telephone or writing);  *Turner*, 482 U.S. at 91-93 (prohibition on inmate-to-inmate correspondence between institutions except among immediate family members upheld; inmates had other means of expression as other correspondence was not restricted).  Here, Mr. Mohammed cannot communicate by telephone, writing, or personal visit with anyone other than the specified persons approved by his SAMs and so a jury could find that alternative modes of communication with his family and community are not available.

3.    Effect of Accommodating the Exercise of the Right

The third *Turner* factor requires considering the impact accommodating inmate would have on guards, other inmates and on allocation of prison resources.  Defendants assert that if Mr. Mohammed were permitted to communicate with an unrestricted number of persons the Government would not be able to adequately monitor his communications and would thereby increase the risks to national security and to the facility.  Alternatively, it would presumably require that additional resources be allocated to monitoring.

Mr. Mohammed's showing is that the undisputed fact that in the past his correspondence was reviewed within shorter time frames and he was not restricted to a defined list of

correspondents.[22]  Because there is evidence that the Government previously has been able to accommodate a more liberal correspondence policy, Mr. Mohammed may be able to show that permitting him to correspond with all of his family would not unduly affect the Government's resources or the effectiveness of the monitoring.  The Defendants' evidence is general and conclusory regarding this factor, with no specifics regarding the actual impact of such a change, and so there is an issue of fact in this regard.

### 4.   Existence of Easy Alternatives

Defendants contend that Mr. Mohammed cannot show that there are easy alternatives that can be used by the Government without limiting his correspondence or that the SAMs are an exaggerated response to the legitimate concerns.  Mr. Mohammed rebuts this by arguing that there is an easy alternative-- the monitoring of his communications should be done by the BOP rather than the FBI.

Mr. Mohammed appears to believe that the extensive delays in the sending and receipt of his mail is due to the FBI's review and that if the BOP instead monitored his mail there would be fewer delays and he would be able to correspond and communicate with more people.  Mr. Mohammed's argument is to some extent speculative in that there is no real evidence that the BOP would be able to perform the monitoring as effectively or, more importantly, as

---

[22]Mr. Mohammed also contends that the BOP could handle the monitoring of Mr. Mohammed's communications, rather than the FBI, which he believes would eliminate the need for restrictions on the number of persons with whom he communicates as well as the incident delays.  These arguments are more pertinent to the fourth *Turner* factor and are discussed in that section.

expeditiously as Mr. Mohammed contends.[23]  Nonetheless, his evidence showing that the

Warden has recommended easing his restrictions and the difference of opinion between the BOP

and the FBI regarding the adequacy of BOP monitoring is sufficient to raise an issue of fact

regarding whether there are easy alternatives to the highly restrictive correspondence list

currently in place.

     5.    <u>Conclusion</u>

Applying the *Turner* factors, Defendants have not shown that Mr. Mohammed's evidence

is insufficient to set out a *prima facie* case with regard to the SAMs that limit his

communications to a narrow and specific list of persons.  Therefore, summary judgment on the

First Amendment claim is inappropriate.

**B.    Claim One: Procedural Due Process**

Mr. Mohammed also asserts that he was denied procedural due process in the imposition

of the SAMs in 1999, and appears to contend that their renewal process violates his due process

rights.  Defendants contend  that Mr. Mohammed's claim regarding the initial imposition of

SAMs in 1999 is time-barred.  In addition, even if the claim is timely, they contend that Mr.

Mohammed cannot carry his burden of proof to establish a due process claim because (1) he

cannot show that the imposition of the SAMs gives rise to a liberty interest protected by

procedural due process and (2) he cannot show the procedures used are inadequate to provide a

---

[23]Mr. Mohammed relies heavily on the findings of a September 2006 report by the Office of Inspector General regarding a review of the BOP's monitoring of mail for high risk inmates. The Government argues that this report concluded that the BOP did not have the necessary knowledge and background to detect terrorist activity.  Defendants have offered evidence to show that the FBI has determined that its Swahili language interpreters are better qualified to translate Mr. Mohammed's communications than the BOP's in-house linguists and that FBI case agents are better able to provide the needed analysis.

meaningful review and opportunity to contest the SAMs restrictions.

As to Defendants' argument that the claim is time-barred, they have the burden of proof. *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n. 4 (10th Cir. 1980) (statute of limitation is an affirmative defense).

  1. <u>Timeliness</u>

With respect to the time-bar, Defendants note that the general limitation period for any civil action against the United States is six years from when the claim first accrues.  28 U.S.C. § 2401(a).  A claim accrues "when the plaintiff discovered or had reason to discover that he has suffered injury due to the defendant's actions."  *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1212 (10th Cir. 2001).  It is undisputed that SAMs were first imposed on Mr. Mohammed in 1999 and that he did not file his Complaint alleging a due process violation until December 27, 2007, which is beyond the six year limitation period.  Therefore, Defendants argue, the claim must be dismissed.

Mr. Mohammed does not offer any persuasive argument or legal authority to show why the statute of limitation would not bar this claim.  Therefore, to the extent his due process claim is premised on the initial imposition of the SAMs, it is barred.

However, because SAMs are renewed every year, those SAMs in effect within the six year period and any modifications made within such period can be timely challenged.  Many of Mr. Mohammed's claims are premised on the modifications occurring around 2005, particularly the restrictions on his non-legal mail.  Thus, to the extent that Mr. Mohammed claims that 2005 modifications were imposed without adequate due process, Mr. Mohammed's claim is timely brought.  Because the procedure is essentially the same every year, the Court may review

whether that process is meaningful. *See, e.g.*, *Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975) ("where an inmate is held in segregation for a prolonged or indefinite period of time due process requires that his situation be reviewed periodically in meaningful way ...").

Defendants argue in the alternative that if every modification or renewal is a new cause of action, Mr. Mohammed would be required to seek a new administrative remedy every year. While exhaustion might theoretically be an issue if Mr. Mohammed were challenging a new condition imposed after his administrative grievance was taken through its appeal steps, that situation does not apply here.[24] Accordingly, Mr. Mohammed has timely brought and adequately exhausted this claim.

### 2.   Adequate Process

To "assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir. 2004) (internal quotation marks and citation omitted). Defendants argue that Mr. Mohammed cannot show that the SAMs infringe upon an interest protected by due process. This complex determination, however, need not be addressed because Mr. Mohammed cannot establish the second element - that he was not afforded an appropriate level of process.

Assuming without deciding that the imposition of SAMs gives rise to a protected

---

[24]However, where restrictions have been lifted or liberalized, Mr. Mohammed's claims might be rendered moot since he seeks only injunctive and declaratory relief.

interest,[25] Mr. Mohammed's argument and evidence are insufficient as a matter of law to

demonstrate inadequate process.   The Supreme Court has determined that due process is

satisfied with respect to an inmate's challenge to a placement decision or conditions of

confinement provided there is (1) a sufficient initial level of process, *i.e.*, a reasoned examination

of the assignment; (2) the opportunity for the inmate to receive notice and respond to the

decision; and (3) safety and security concerns to be weighed as part of the placement decision.

*Wilkinson v. Austin*, 545 U.S. 209, 226-27 (2005).   Where a decision "draws more on the

experience of prison administrators, and where the State's interest implicates the safety of other

inmates and prison personnel, [ ] informal, nonadversary procedures" that allow notice and the

opportunity to be heard are sufficient.   *Id.* at 228-29.

　　The process for determining whether SAMs are to be renewed satisfies the first factor–a

reasoned examination of the assignment or restrictions.   The evidence establishes that there is an

extended process whereby input is received from the inmate, the Warden, and from the relevant

DOJ authorities, and the decision is made based on criteria set forth in the regulations.[26]   The

most recent notice of renewal to Mr. Mohammed sets forth the reasons for the determination to

---

[25]As Defendants note, in his response brief Plaintiff raised a number of issues relating to
his housing assignment, the H-Unit, where all inmates subject to SAMs are housed, as opposed
to merely the effect of the SAMs alone.   Even if the Court were to permit this amendment, it
nonetheless determines that the claim would fail.   Defendants have presented undisputed
evidence to show that the general conditions of confinement in the H Unit (as distinguished from
SAMs restrictions) are not significantly different from those of the ADX general population.
The Court has previously determined that the living conditions in ADX do not give rise to a
protected liberty interest.   *Georgacarakos v. Wiley*, Civil Action No. 07-cv-01712-MSK-MEH,
2010 WL 1291833 (D. Colo. Mar. 30, 2010).

[26]Moreover, the initial decision to impose SAMs on Mr. Mohammed was appropriate in
light of his then-recent activities and involvement in terrorist organizations.

continue the restrictions, including the facts specific to Mr. Mohammed.

The second factor is also established here, as the inmate is given notice and an opportunity to provide input through an in-person interview and otherwise before the renewal decision is made.  In addition, the inmate can contest specific conditions and request modifications through the Administrative Remedy Program.  Mr. Mohammed has been successful in obtaining modifications and so there is evidence that this is a meaningful remedy, even if he has not received all of the modifications he has requested.

Finally, the decision to impose or renew SAMs implicates safety and security interests and the restrictions as a general matter relate to those interests.

Mr. Mohammed attempts to rebut these showings by contending that the Administrative Remedy Program is not meaningful because the Attorney General, rather than the Bureau of Prisons, makes the final decisions regarding SAMs. Implicit in his position is the belief that his comments are not conveyed to the decisionmaker.

 The record is somewhat unclear in this regard but does establish that the inmate's input is transmitted to all the relevant agencies.  Therefore, regardless which agency has the ultimate decision-making authority, there is adequate process.

Mr. Mohammed also argues that he is never given a factual summary of what forms the basis of the determination that he poses a danger.  This, however, is not required under these circumstances.  *See Estate of DiMarco v. Wyoming Department of Corrections*, 473 F.3d 1334, 1345 (10th Cir. 2007) (witness testimony and other trappings of adversarial proceedings not required to satisfy due process in inmate placement review process).  Accordingly, Defendants are entitled to summary judgment on the due process claim.

26

### C.      Claim Seven: Eighth Amendment

Mr. Mohammed also asserts an Eighth Amendment claim, arguing that the conditions of

his confinement amounts to cruel and unusual punishment.  The bases for this claim have shifted

over time.[27]  As presently formulated in Mr. Mohammed's response brief, he appears to assert

that the isolation and depression he feels as a result of the entirety of the restrictions upon him,

including the SAMs limitations on his communications, amount to cruel and unusual

punishment.  As to this claim, Mr. Mohammed bears the burden of proof.

Where conditions of confinement are egregious and inhumane, they may constitute "cruel

and unusual punishment" in violation of the Eighth Amendment.  Prison officials must "provide

---

[27]As stated in his Complaint, Mr. Mohammed's Eighth Amendment claim is premised on the following alleged conduct by Defendants:

> . . . limiting Plaintiff's access to sunlight and fresh air, and by limiting his opportunities for exercise to sporadic and infrequent exercise within small cages . . . [and] imposing the SAMs restrictions on him and placing him in the H Unit ADX for about 9 years with continuing restriction from SAM and ADX policies and H Unit's policies and behaviors

Prisoner Complaint, #**95**, at 43.  The Complaint also contains other allegations that plausibly relate to his Eighth Amendment claim, specifically the number of showers he was permitted and the scanning of food to check for contraband. When asked about the basis of his Eighth Amendment claim in his deposition, Mr. Mohammed stated that the SAMs restrictions kept him from maintaining relationships with his family, and that the monitoring and translation of his communications delays transmittal of letters too long.  He also contends that noise in the unit from opening and closing gates and grilles at night prevents him from sleeping and that some officers do this intentionally.

Mr. Mohammed also asserted that his cell was kept too cold.  Defendants argued in their motion for summary judgment that this aspect of the claim was not administratively exhausted and Mr. Mohammed conceded this.  Mr. Mohammed's cell temperature, therefore, is not a fact considered in the evaluation of Mr. Mohammed's Eighth Amendment claim.   It appears, based on his response brief, that Mr. Mohammed no longer relies on the frequency of showering opportunities, out-of-cell recreation opportunities, or scanning of his food as grounds for his Eighth Amendment claim.

humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (citations omitted). To prevail on a "conditions of confinement" claim under the Eighth Amendment, an inmate must establish that (1) the condition complained of is sufficiently serious to implicate constitutional protection, and (2) prison officials acted with deliberate indifference to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). In order to satisfy the first requirement, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id*. Deliberate indifference, the second requirement, "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." *Id*. at 835.

Mr. Mohammed has not come forward with evidence to demonstrate that he has been deprived of adequate food, clothing, shelter, medical care, or safety.[28] He therefore cannot show a violation of the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (to state an Eighth Amendment claim, the inmate must show the deprivation of a "single identifiable human need such as food, warmth, or exercise"). His evidence that he feels loneliness and isolation as a result of the SAMs restrictions on his contacts and communications suggests another need - the need for association with other people. Assuming, without determining, that human association is a basic need, the Court observes that Mr. Mohammed has not been deprived of all association,

---

[28]While Mr. Mohammed's claim regarding noise at night in the facility could implicate the basic human need for sleep, his facts demonstrate only an annoyance, not a condition posing a substantial risk of serious harm. *See generally Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir.1994) ("Subjecting a prisoner to a few hours of periodic loud noises that merely annoy, rather than injure the prisoner does not demonstrate a disregard for the prisoner's welfare.").

only contact with particular family and friends.  Thus, the Court declines to find a deprivation that is sufficiently serious to rise to constitutional magnitude.[29]

In addition, this Court and others have previously held that the general conditions of confinement at ADX, while harsh, do not amount to a deprivation of the inmates' Eighth Amendment rights to be free of cruel and unusual punishment.  *Georgacarakos v. Wiley*, Civil Action No. 07-cv-01712-MSK-MEH, 2010 WL 1291833 (D. Colo. Mar. 30, 2010); *see also Sattar v. Gonzales*, Civil Action No. 07-cv-02698-WDM-KLM, 2009 WL 606115 (D. Colo. Mar. 6, 2009).  Therefore, Mr. Mohammed cannot carry his burden to demonstrate that either his SAMs or the general housing conditions at the H Unit will support his claim for a violation of his Eighth Amendment rights.

### D.     Remaining Motions

Mr. Mohammed filed a motion (# **216**) requesting that certain exhibits (15, 17, 18, 22, 23, 27, 28, 30, 34, 37, and 44) be filed under seal; Defendants join in this motion.  Mr. Mohammed cites to the parties' confidentiality agreement but provides no other specific information or basis for sealing these documents.  Defendants, in their joinder of the motion, contend that the materials at issue would reveal details of the Government's investigation and investigatory techniques focusing on terrorism.  They also request that two additional documents, Mr. Mohammed's Exhibits 16 and 26, be sealed for the same reason and because these documents contain identifying information about other persons who are not parties to the litigation.

---

[29]    Both parties have introduced medical records showing that Mr. Mohammed has been treated within the facility for depression and other medical conditions. Indeed, recent records submitted with Defendants' reply brief show that Mr. Mohammed has declined medication for depression because he states he no longer feels depressed.

The public has a presumptive right to review court documents. *United States v. McVeigh*, 119 F.3d 806, 811(10th Cir. 1997). Documents should be sealed only if the right to access is outweighed by the interests favoring non-disclosure. *Id.* (citation omitted). Pursuant to D.C.COLO.LCivR 72, a stipulated protective order executed by the parties, standing alone, does not justify sealing of a document. Rather, a motion to seal must address (1) the nature of the material sought to be sealed, (2) the private interest that, when weighed against the presumption of public access, warrants the relief sought, (3) the clearly defined and serious injury that would result if the relief sought is not granted, and (4) why a less restrictive alternative to the relief sought is not practicable or would not adequately address the interest in question. D.C.COLO.LCivR 72.C. The parties' conclusory statements and reliance on their confidentiality agreement are insufficient to meet their burden to overcome the presumption of public access. Accordingly, the motion to seal is denied. The documents shall remain sealed for 30 days from the issuance of this order, after which they will be unsealed absent the granting of a motion to continue their sealed status.

In another motion (#**225**), Mr. Mohammed seeks to strike portions of the Defendants' reply brief or, in the alternative, to be permitted to file a sur-reply to address purportedly new issues raised for the first time in the reply. Specifically, Mr. Mohammed contends that Defendants' introduction of evidence regarding the Special Security Unit Program should be stricken because the program is relatively new and was not in place when Mr. Mohammed first filed his Complaint.[30] Mr. Mohammed also seeks to strike any reference to the newest

---

[30]However, Mr. Mohammed himself refers to the Special Security Unit Program in his response brief (#**214-1** at 88), relying on his advancement to Phase Two as evidence of his generally good behavior in the facility.

procedures, such as an in-person meeting, in connection with the renewal of the SAMs.  Mr.

Mohammed requests that the Court not consider the recent liberalization of Mr. Mohammed's

SAMs, such as the addition of four persons with whom he may communicate and expanded

television and publication access, because he claims that these steps were taken in order to "moot

out" his claims.  However, Mr. Mohammed's lawsuit seeks only declarative and injunctive

relief, which are forward-looking remedies.  The Court need not make declarations or enjoin any

practices that have already been remedied and so this evidence is considered in the resolution of

the motion for summary judgment.  For the same reasons, Defendants' Motion for Leave to

Supplement (#**230**) is granted.

Mr. Mohammed further seeks to strike any reference to the reason that Mr. Mohammed

was prohibited to have contact with Nassor Khamis Mohammed, Mr. Mohammed's adoptive

brother, because the Government has apparently been inconsistent in this regard.  This issue is

moot as Mr. Mohammed has recently been granted permission to communicate in writing with

this individual but the Court takes note of the inconsistency.  Mr. Mohammed also points out that

in the motion for summary judgment, the Government claimed that Mr. Mohammed's

communications were restricted to his immediate family in 2005 because members of his

extended family may have had some peripheral involvement in the bombing or other illegal

activities; in the reply brief, however, the Government for the first time contends that the

restrictions were enacted because other inmates had succeeded in transmitting messages to

terrorist networks despite their SAMs.  Again, the Court observes the apparent inconsistency

identified by Mr. Mohammed but does not require any additional briefing on this issue.

Therefore, the motion to strike is denied, as is Mr. Mohammed's alternative request to

file a sur-reply.

**IT IS THEREFORE ORDERED** that

(1)     Claims Two, Three, Five, and Six of Mr. Mohammed's Complaint are

**DISMISSED WITHOUT PREJUDICE** pursuant to Mr. Mohammed's request.

(2)     Defendants' Motion for Summary Judgment (**#167**) is **GRANTED IN PART**

**AND DENIED IN PART**.  The Motion is granted as to Claims One and Seven of

the Complaint.  The Motion is denied as to Claim Four.

(3)     Mr. Mohammed's Motion to Strike/or for Request to Response (**#225**) is

**DENIED**.

(4)     Mr. Mohammed's Motion for Request to File Exhibits Under Seal (**#216**) is

**DENIED** without prejudice to refiling the motion or refiling the exhibits in

redacted form.  The exhibits shall remain under seal for 30 days from the date of

issuance of this order.

(5)     Defendants' Motion for Leave to Supplement (**#230**) is **GRANTED**.

(6)     The Court shall appoint *pro bono* counsel, if available, to assist Mr. Mohammed

in the trial of his First Amendment claim.

Dated this 29th day of September, 2011

**BY THE COURT:**

Marcia S. Krieger

Marcia S. Krieger
United States District Judge

32